ORIGINAL

FILED

AUG - 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RUSSELL KAEMMERLING, 04899-017
DANIEL SILER, 10183-078
RODNEY DOGGETT, 83059-080
BRIAN CULWELL  66552-079
and RONNIE TRIPLETT, 15692-064
Plaintiffs

§
§
§
§
§
§

v.

HARLEY LAPPIN, DIRECTOR,
FEDERAL BUREAU OF PRISONS and
ALBERT GONZALES, UNITED STATES
ATTORNEY GENERAL,
Defendants

CASE NUMBER  1:06CV01389

JUDGE: Reggie B. Walton

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 08/●/2006

JURY
ACTION

## PLAINTIFFS' ORIGINAL COMPLAINT, REQUEST FOR
## DECLARATORY JUDGMENT AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs, Pro Se, individually and on behalf of all others similarly situated, file this Original Complaint and Request for Declaratory Judgment and show the following:

## A. Parties

Plaintiffs are citizens of the State of Texas and reside at FCI Seagoville, Texas.

Defendant Harley Lappin is the Director of the Federal Bureau of Prisons and may be served with process pursuant to 28 U.S.C. 1391(e). Defendant, Albert Gonzales is the United States Attorney General, and may be served with process pursuant to 28 U.S.C. §1391(e).

All other Plaintiffs similarily situated include those

1

individuals incarcerated, on supervised release, probation or
parole.

## B. Jurisdiction & Venue

Jurisdiction is invoked pursuant to 28 U.S.C. §1331 because the
action arises under 42 U.S.C. §2000bb, Religious Freedom Restoration
Act (RFRA), the 1st, 4th, and 5th Amendment of the United States
Constitution. Venue is proper pursuant to 28 U.S.C. §1391(e).

## C. Administrative Remedies

Congress has directed the collection of DNA samples from all
federal prisoners convicted of any felony. Defendants have a duty to
follow Congress' directive. Typically, the Prison Reform Litigation
Act (PLRA) requires prisoners to pursue relief through
administrative procedures before filing a lawsuit; however, the BOP
lacks any authority to provide any relief or take any action
whatsoever.

In Booth v. Churner, 149 L.Ed.2d 958 (2001), the Supreme Court
stated "we will not read futility into statutory exhaustion
requirements where Congress has provided otherwise. Congress has
provided in §1997e that an inmate must exhaust irrespective of the
forms of relief sought and offered through administrative avenues."
However, the Court also held "where the relevant administrative
procedure lacks authority to provide relief or to take any action
whatsoever in response to a complaint" exhaustion is not required.

2

<u>Id</u>. The Court reasoned that "without the possibility of some relief, the administrative officers would have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." Accordingly, because the Bureau of Prisons has no authority to provide any relief, Plaintiffs are not required to exhaust any administrative remedies.

### D. Facts

In 2000, Congress enacted the DNA "Backlog Elimination Act" (The Act) directing the BOP and the Probation Office to collect DNA samples from individuals convicted of "qualifying" offenses as set forth in 42 U.S.C. §14135(a)(1)(B). The Act was amended in 2004 to broaden the "qualifying" federal offenses to include <u>any felony</u>. The Act directs Defendant Lappin to collect a DNA sample from each individual in the custody of the BOP and the probation office responsible for supervision of an individual on probation, parole or supervised release. The Probation Office is under the supervision of Defendant Alberto Gonzales.

In March 2006, officials at FCI Seagoville held a "town-hall" meeting informing all inmates that they intended to begin collection of DNA samples pursuant to the Defendant's directive under The Act. Shortly, thereafter, F.C.I. - Seagoville began collecting DNA samples from incarcerated individuals. The Act and Defendants' actions pursuant to The Act violate Plaintiffs' constitutional rights.

## E. Count 1 Declaratory Judgment

Plaintiffs bring this claim for declaratory judgment under both the Federal Rule of Civil Procedure 57 and 28 U.S.C. §§2201, 2202. Plaintiffs seek injunctive relief and a declaration that The Act is unconstitutional because The Act violates, inter alia, Plaintiffs' rights under the RFRA.

An actual controversy exists because The Act mandates the collection of DNA samples from Plaintiffs and The Act is unconstitutional. Plaintiffs suffer direct harm from enforcement of the challenged act because fundamental rights, including religious freedom rights, will be violated. Accordingly, declaratory judgment action is proper. See <u>Babbit v. United Farm Workers Nat'l Union</u>, 60 L.Ed.2d 8 (1979); <u>Stout v. Hendricks</u>, 338 F. Supp. 568 (S.D. Ind. 1968).

## F. Count 2 - Violation of Religious Freedoms

The Act and Defendants' enforcement of The Act violates the 1st Amendment of the United States Constitution. The 1st Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Plaintiffs' sincerely held religious beliefs do not allow their consent in providing the Government a DNA sample. The mandatory nature of The Act substantially burdens Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs' free exercise of their religious rights.

Defendant's enforcement of the ACT also violates the Religious Freedom restoration Act. (RFRA) "The RFRA applies to federal officers and agencies like the BOP." Gartrell v. Ashcroft, 191 F.Supp.2d 23, 36 (D.D.C. 2002). The RFRA is applicable to prisoners. See Cutter v. Wilkinson, 161 L.Ed.2d 1020 (2005).

Plaintiffs are Evangelical Christians who profess a belief in Jehovah God as Sovereign in the Universe; accept both the Old and New Testaments of the Christian Bible, in its original autographs, as the inerrant and infallible Word of God; and affirm the fact that God is the creator and sustainer of all creation, including mankind. "In the beginning God created the heavens and the earth." Genesis 1:1 NIV (All Biblical quotations come from the New International Version of the Bible, copyright 1984, Zondervan Publishing Company)

"It is inappropriate for a reviewing court to attempt to assess the truth or falsity of an announced article of faith. Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy." Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025, 1030 (1982)

Plaintiffs attest to and affirm the fact that mankind is the crown of God's creative act, the only aspect of creation stated to be made in the image of God. "So God created man in his image, in the image of God he created him; male and female he created them." Genesis 1:21 NIV. The particularity of the work of God in man's existence is further revealed when Scripture records God's words to Jeremiah, "Before I formed you in the womb I knew you." Jeremiah 1:7 NIV and "For you [God] created my inmost being; you knit me together

in my mother's womb." Psalm 139:13 NIV

Sacred Scripture clearly demonstrates the central and essential importance of the individual human flesh and blood body in the Christian faith. The earliest declaration of man's eternal existence is described as the resurrection of the individual body in the Book of Job, the Bible's oldest writing. In this scripture, Job declares his faith that "after my skin has been destroyed, yet in my flesh I will see God." Job 19:26 NIV. The prophet Daniel articulates that fundamental and essential view at the time of the exile of the Jewish nation. "Multitudes who sleep in the dust of the earth will awake." Daniel 12:2 NIV

Bodily resurrection is one of the fundamental and foremost tenets of the teaching of Jesus Christ, the central element of Christian teaching and belief. Jesus Christ stated clearly, "for my Father's will is that everyone who looks to the Son and believes in him shall have eternal life, and I will raise him up at the last day." John 6:40 NIV cf. John 11:25-26; Matthew 16:21; 28:6; Luke 24:38, 39; John 20:27. Resurrection of the body was confirmed as one of the core beliefs and promises to all Christians by the bodily resurrection of Jesus Christ. "Praise be to the God and Father of our Lord Jesus Christ! In his great mercy he has given us new birth into a living hope through the resurrection of Jesus Christ from the dead." 1 Peter 1:3 NIV. This belief is so central to the Christian belief that, lacking a bodily resurrection of Jesus Christ, there would be today no Christian church and its absence would vitiate the core expectation of every Christian.

Paul the Apostle, a key leader of the early churches and writer

of more than half of the New Testament, speaks to the relationship
of the present earthly body as the seed of the resurrected body in 1
Corinthians 15:42-44. He also stresses the importance of the body in
1 Thessalonians 5:23, actually establishing it as on par with the
soul and the very spirit of man. Paul further establishes that this
mortal body exists specifically for the revealing of the life of
Jesus to others, "so that the life of Jesus may also be revealed in
our body." 2 Corinthians 4:10 NIV.

It is a core belief of Evangelical Christianity that it is in
each individual man's body that he, or she, will stand either before
the Bema, the reward seat of Jesus Christ to "receive what is due
him for the things done while in the body," 2 Corinthians 5:10 NIV,
or the White Throne judgment seat (Revelation 20:12-13) of God.

As an Evangelical Christian each plaintiff believes that at his
conversion the Holy Spirit of God, one in essence with God, the co-
equal, co-existent and co-eternal third person of the Trinity,
permanently, in a supernatural occurrence, entered and now indwells
his body, making his body literally and in fact, a temple of the
living God. "Don't you know that you yourselves are God's temple and
that God's Spirit lives in you?" 1 Corinthians 3:16 NIV. This
creates in each Christian, and therefore in each Plaintiff, a
responsibility that is clearly enunciated by the Apostle Paul when
he says, "Therefore I urge you, brothers, in view of God's mercy, to
offer your bodies as living sacrifices, holy and pleasing to God --
this is your spiritual act of worship." Romans 12:1 NIV.

Modern science unequivocally rests on the assertion that DNA is
the building block of life. See U.S. v. Kincade, 379 F.3d 813, 818

FN4 (9th Cir. 2004). Plaintiff's accept that premise and acknowledge that fact as a foundational aspect and inseparable component of God's creative work. This incontrovertible fact of science, therefore, makes it rationally, ethically and spiritually antithetical and uncompromisingly repugnant to the strongly held foundational beliefs of each Plaintiff to be required to defile God's temple, as represented by one's mortal body, filled with the Holy Spirit by involuntarily, or in any manner, submitting to DNA sampling, collection and storage with no clear limitations of use, merely to satisfy the broadly overreaching efforts of secular authorities, politicians and their representatives.

Such an act not only creates a moral violation as an act in and of itself but also removes any act of volition in controlling the use of said sample thus stored. It leaves the Christian totally vulnerable to the individual, unknowing and unforeseen aiding and abetting of further activities including those not currently described, conceived, or contemplated that he would find morally reprehensible and violative of his core, foundational and strongly held Christian beliefs: beliefs that, in fact, form the very essence of his view of the purpose of life and existence itself.

> The approval of such a program carries with it all of the dangers inherent in allowing the government to collect and store information about its citizens in a centralized place. . . . Even government with benign intentions have proven unable to regulate or use wisely, vast stores of information they collect regarding their citizens. . . . This has profound social effects [violative of strongly held religious beliefs] because it alters the balance of power between the government and the people, exposing individuals to a series of harms, [including the violation of Christian beliefs] increasing their vulnerability and decreasing the degree of power that they exercise over their lives.

U.S. v. Kincade, supra, at 843.

8

This, in fact, broaches new frontiers and elements of law that strike at the very core and elemental aspects of individual rights and freedoms, much less privacy.

The mapping of the human genome which has enhanced the uses of DNA, resulted in the Federal Bureau of Investigation issuing directives encouraging all laboratories doing DNA analysis to maintain a portion of the evidence samples they collect affording the federal government the opportunity to re-test and re-analyze samples as science progresses. See Federal Bureau of Investigation: "Standards for Forensic DNA Testing Labs" @ 7.2.

This has the potential of non-consensual participation in cloning experiments and stem-cell research, as just two examples of activities each of the Plaintiffs find morally repugnant and ethically reprehensible and violative of their core, fundamental and strongly held Christian beliefs.

The Government in times past has shown its propensity to repeated, unsanctioned and clandestine use of humans, their bodies and vital organs, for medical and, or, scientific, research. Ongoing advancements in technology even now allow human experimentation of a nearly incomprehensible range to occur using human DNA in its most embryonic and elemental stages. There is no rationally definable limitation as to future development in such experimentation. The collection and retention of Plaintiffs' DNA has the clear and undeniable potential, even probability, of making them unwilling participants in such heinous actions, further violating their deeply held Christian beliefs.

The fact that scientists currently lack the capacity to

comprehend the full significance of the data stored within junk
DNA samples is irrelevant. CODIS retains individual DNA samples
forever . . . DNA stores and reveals massive amounts of personal
private data and the advance of science promises to make stored
DNA only more revealing in time.

U.S. v. Kincade, supra, @ 850.

There exists no positive policy, process, technology, or plan to
protect such collected DNA from such use, or abuse, either as a part
of legally sanctioned activity, or by rogue employees with access to
such samples.

    Violating the bodies of Plaintiffs by involuntary and/or forced
collection of DNA samples by any means, with or without the
foreseeable use, or abuse of such samples in future scientific,
legal or illegal uses and applications, unquestionably violates
their strongly held and deeply rooted convictions as Evangelical,
Bible-believing Christians.

    In addition to the violation of their bodies as Temples of God,
there are undeniable prophetic considerations to Bible-believing
Christians. The Bible, speaking prophetically of the events of the
end of time, foretells the rise of a world ruler commonly referred
to as anti-christ. The prophet Daniel clearly speaks of this coming
demon:

    A stern-faced king, a master of intrigue, will arise. He will
    become very strong, but not by his own power. He will cause
    astounding devastation and will succeed in whatever he does. He
    will destroy the mighty men and the holy people. He will cause
    deceit to prosper, and he will consider himself superior. When
    they feel secure, he will destroy many and take his stand
    against the Prince of princes.

Daniel 8: 23-25 NIV

    John the Apostle, in his revelation on the Isle of Patmos speaks

prophetically of the same individual that is to come:

> The beast was given a mouth to utter proud words and blasphemies and to exercise his authority for forty-two months. He opened his mouth to blaspheme God, and to slander his name and his dwelling place and those who live in heaven. He was given power to make war against the saints and to conquer them. And he was given authority over every tribe, people, language and nation . . .. He also forced everyone, small and great, rich and poor, free and slave, to receive a mark on his right hand or on his forehead so that no one could buy or sell unless he had the mark, which is the name of the beast of the number of his name. . . . His number is 666.

Revelation 13: 5-7; 16-18

As the Apostle John prophesies concerning the judgment of Almighty God on this anti-christ, he indicates that some in the earth will mourn the anti-christ's death because of the loss of commerce which will include the "bodies and souls of man." Revelation 18:13 NIV.

The Plaintiffs unequivocally believe that forcing them to provide DNA sampling is tantamount to laying the foundation for the rise of the anti-Christ. An essential element of this belief is the "storage" aspect of the plan for sampling. The plan is deficient not only in its purpose and objective, it lacks clear control and accountability during the life of the Plaintiffs and leaves totally open the issue of the use of samples after the death of the Plaintiffs and during that time preceding their bodily resurrections. Though when the anti-christ does finally make the scene of human history, Plaintiffs may all have departed this life, the genetic mapping they are being forced to deposit and yield all control over to an undefined and uncontrollable authority, likely would have a detrimental effect on their easily identified descendents.

11

Further, scientific advances make it an impossibility for any authority to state with certainty that such heinous uses will not be made with Plaintiffs' DNA.

Further, in several scriptures, God uses the mortal body as an analogy to explain His relationship to those who are His by the act of and right of having accepted Him. Ephesians 5:23 NIV "Christ is the head of the church, his body, of which he is the Savior." The analogy further extends to and is inclusive of the understanding of the very functioning of the church. In 1 Corinthians 12:14, as an example, Paul the Apostle wrote, "Now the body is not made up of one part but of many. If the foot should say, 'Because I am not a hand, I do not belong belong to the body.' it would not for that reason cease to be a part of the body. And if the ear should say, 'Because I am not an eye, I do not belong to the body,' it would not for that reason cease to be part of the body."

With the physical body of man used by God to proclaim the functioning of His church, the significance of that body, and its DNA, is manifest and Plaintiffs' most sincerely believe that the requirement of submitting to DNA profiling and storage of same in a government databank in its act and further in the absence of any controls and assurances as to the use of that sample, is violative of their sincerely held and deeply rooted core religious beliefs. Their allegiance must first, foremost and above all remain with and to the God who created them and their bodies, who sustains them and who provids for their redemption. "We must obey God rather than man." Acts 5:29 NIV

"I cannot give up my guidance to the magistrate; because he

knows no more of the way to heaven than I do & is less concerned to direct me right than I am to go right." Jefferson, <u>Notes and Proceedings on Discontinuing the Establishment of the Church of England</u> (1776), in I the Papers of Thomas Jefferson 525, 547 (J. Boyd ed. 1950), quoted in <u>Africa v. Commonwealth of Pennsylvania</u>, supra @ 1030 fn7.

The Scripture is replete with examples of Christians not bowing to idol worhsip or consenting to governmental mandates. See e.g. Daniel 3 where three Jewish men in Exile in ancient Babylon refused to bow before a gold statue and were subsequently tossed into a fiery furnace. If the Defendants are allowed to obtain a DNA sample as an "identification" matter, Plaintiffs believe that the next logically resultant step is Defendants will also be allowed to insert "RFID" chips into Plaintiffs' bodies; all contrary to Plaintiffs' sincerely held religous beliefs and the Sacred Scripture.

The exercise of religion is a "fundamental right." Of the now-called "fundamental rights", practically all were also deemed "natural" rights by the founding fathers. This is assuredly so of freedom of religion. See <u>Torcaso v. Watkins</u>, 6 L.Ed.2d 982 (1961). The fundamental right of the free exercise of religion is enjoyed by prisoners as well. Even prisoners enjoy many protections of the Constitution, and generally retain all the rights of ordinary citizens, except those expressly, or by necessary implication, taken from them by law. See <u>Cruz v. Beto</u>, 31 L.Ed.2d 263 (1972). Further, "prisoners must be provided with a reasonable opportunity to exercise their religious freedom guaranteed under the 1st

Amendment." <u>Hudson v. Palmer</u>, 82 L.Ed.2d 393 (1984).

The RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. §2000bb. Under the RFRA, the Government may substantially burden a person's exercise of religion, only if it (the Government) demonstrates that a compelling governmental interest is furthered and the Government's measures are the least restrictive means of furthering that compelling interest. The Act and Defendants' enforcement cannot withstand such strict scrutiny analysis.

Even a legitimate and substantial governmental purpose cannot be achieved by means which are unnecessarily broad and which tend to stifle fundamental personal liberties when that end might be more narrowly achieved. If there are other, reasonable ways to achieve a compelling government purpose with lesser burden on the constitutionally protected activity.

The Act does not serve a compelling governmental interest; however, if so, there exists less restrictive measures by which the Government can achieve its objectives. Moreover, the Government has the burden of establishing that a government restriction which affects a fundamental right is necessarily related to a purported compelling interest.

The guarantee of a constitutional right ensures the citizen the privilege of having such a right judicially declared and protected, (E.g. <u>Lawrence v. State Tax Commission of Mississippi</u>, 76 L.Ed. 1102 (1932)], and the courts are ever alert to protect the citizen

against encroachment by the Government, since experience has shown
that where such encroachment is extended, a corresponding liberty is
curtailed, seldom if ever to be restored.

The astute and learned Justice Rinehardt in his dissent in U.S.
v. Kincade, 379 F.3d 813 (9th Cir 2004), clearly articulated the
issues:

> "They that can give up essential liberty to obtain a little
> safety deserve neither liberty or safety."

> We would be lucky indeed if it were possible to so limit the
> effect of their opinions, for under the rationale they espouse,
> especially the plurality's, all Americans will be at risk sooner
> than later, of having our DNA samples permanently placed on file
> in federal cyberspace and perhaps even worse, of being subjected
> to various other governmental programs providing for
> suspicionless searches conducted for law enforcement purposes.

> The approval of such a program carries with it all of the
> dangers inherent in allowing the government to collect and store
> information about its citizens in a centralized place. J. Edgar
> Hoover terrorized leaders of the civil rights movement by
> exploiting the information he collected in his files. Our
> government's surveillance and shameful harassment of suspected
> communists and communist-sympathizers in the middle of the 20th
> Century depended largely on the centralization of information
> collected about countless numbers of non-communist members of
> our society--often by means that violated the Fourth Amendment.

> Even governments with benign intentions have proven unable to
> regulate or use wisely, vast stores of information they collect
> regarding their citizens. . . . This has profound social effects
> because it alters the balance of power between the government
> and the people, exposing individuals to a series of harms,
> increasing their vulnerability and decreasing the degree of
> power that they exercise over their lives.

> Thomas Jefferson once warned that '[t]he time to guard against
> corruption and tyranny is before they shall have gotten hold of
> us. It is better to keep the wolf out of the fold, than to trust
> to drawing his teeth and talons after he shall have entered.'
> Thomas Jefferson, Notes on The State of Virginia 121 (William
> Peden, ed., 1955). The plurality has failed to heed this
> warning, and instead opens the door to multifarious law
> enforcement programs involving suspicionless searches . . ..",

> The fact that scientists currently lack the capacity to
> comprehend the full significance of the data stored within junk
> DNA samples is irrelevant . . .. Moreover, the FBI encourages

15

all laboratories to retain portions of the evidence samples that collect . . . affording the federal government to re-test and re-analyze a virtually limitless number of samples as science progresses. (The Act also neither requires, nor recommends, destruction of samples after analysis) . . .. More ominously, some have predicted that the DNA profiles entered into CODIS will someday be able to predict the likelihood that a given individual will engage in certain types of criminal, or non-criminal but perhaps socially disfavored behavior . . . .. To say that CODIS profiles might actually be used for such purposes is hardly farfetched.

It is undoubtedly true that were we to maintain DNA files on all persons living in this country, we would make the resolution of criminal investigations easier. The same would be true were we willing to sacrifice all of our interests in privacy and personal liberty. Those who won our independence chose, however, not to follow that course, but instead to provide us with the safeguards contained in the Fourth Amendment. We, as judges, do not have the authority to sacrifice those constitutional protections.

When democratic values are lost, society often looks back, too late, and says when did this happen--why didn't we understand before it was too late? Today's decision marks one of those turning points--a fatally unwise and unconstitutional surrender to the government of our liberty  for the sake of our security, and should the plurality's theory ever become law, the establishment of a doctrine that would leave us without the legal tools to halt further abolition of our privacy rights. The compulsory extraction of blood samples and the maintenance of permanent DNA profiles of American citizens is, unfortunately, the beginning not the end. 1984 arrives twenty years later than predicted.

Finally, no one should take comfort from the fact that today's decision is well-intentioned--or that it is purportedly limited to convicted offenders. As Justice Brandeis once wrote, "it is also immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding' . . .. The erosion of conditional releasees' liberty makes us all less free. Privacy erodes first at the margins, but once eliminated, its protections are lost for good, and the resultant damage is rarely, if ever, undone.

Freedom of religion is a fundamental, natural and absolute right, deeply rooted in the American constitutional system. It is a

right available to all. The free exercise of religion includes the
right to believe and profess whatever religious doctrine one
desires. The Government may not compel any affirmation of religious
beliefs, punish the expression of religious doctrine it believes to
be false, impose special disablities on the basis of religious views
or religious status, or lend its power to one or the other side in
controversies over religious authority or dogma. See <u>Employment
Div., Dept. of Human Resources of Oregon v. Smith</u>, 108 L.Ed.2d 876
(1988).

Plaintiffs' sincerely held beliefs are not merely
"philosophical" and "personal" but rather are sincerely held
<u>religious</u> beliefs and contentions. There is no requirement, however,
that religion meet any organizational or doctrinal test to qualify
for 1st Amendment protection. E.g. <u>Sequoyah v. Tennessee Valley
Authority</u>, 620 F.2d 1159 (6th Cir. 1980).

Unquestionably, Plaintiffs assert a sincerely held religious
belief. Moreover, The Act unquestionably places substantial burdens
on Plaintiffs' free exercise of their religious rights.  The
resolution of the question of what is a religious belief or practice
protected by the Free Exercise Clause does not turn upon any
judicial perception of the particular belief or practice in
question; religious beliefs need not be acceptable, logical,
consistent, or comprehensible to merit 1st Amendment protection. See
<u>Thomas v. Review Bd. of Indiana Employment Sec. Division</u>, 67 L.Ed.2d
624 (1981).

The constitutional provision prohibiting abridgment of religious
freedom and establishment of religion is to be broadly interpreted

17

held by McGowan v. State of Maryland, 6 L.Ed.2d 393 (1961), in light of its history and the evils it was designed to suppress.

Because The Act substantially violates Plaintiffs' religious rights, The Act is unconstitutionally facially and as it applies to Plaintiffs.

## G. Count 3 - Equal Protection Violation

Equal Protection as provided in the Fifth Amendment of the U.S. Constitution, requires equal or similar treatment of all persons who are similarly situated. See Giano v. Senskowski, 54 F.3d 1050 (2nd Cir. 1995). The Equal Protection Clause bars a governing body from applying a law dissimilarly to people who are similarly situated. Even if §14135a is constitutional on its face, which it is not, The Act is unconstitutional as applied.

The Act requires all federal offenders in custody for convictions of any felony to submit a DNA sample to be stored in CODIS. As such, The Act created a class of persons consisting of all federal offenders. The Act is being unevenly applied to only some federal offenders. The B.O.P. is collecting samples from offenders who are currently incarcerated or who are currently on supervised release.

Felons who are no longer incarcerated (Free Felons), consisting of the vast majority of felons are not being required to submit a DNA sample pursuant to The Act, therefore enforcement has a discriminatory effect on Plaintiffs and those similarly situated (Incarcerated Felons) and offenders on supervised release

18

(Supervised Felons.) The uneven application of The Act violates the
Plaintiff's Equal Protection rights and has a discriminatory effect
on Plaintiffs and those similarly situated.

A governing body may not draw distinctions between individuals
solely on differences that are irrelevant to a legitimate
governmental objective. The Government is drawing distinctions
between individuals solely on differences that are irrelevant to a
legitimate governmental objective by enforcing The Act on
Incarcerated and Supervised Felons, but not on Free Felons.

The District of Columbia District Court has held that "concepts
of equal protection are inherent in due process of law guaranteed to
the citizens of District of Columbia by the Fifth Amendment." Wilson
v. District of Columbia, 338 A2d 437 (Dist Col App 1975). §14135a
violates equal protection principles inherent in the Due Process
Clause. "Although the Fifth Amendment contains no Equal Protection
Clause, it does forbid discrimination . . . violative of due
process; thus, if classification would be invalid under the Equal
Protection Clause of the Fourteenth Amendment, it is also
inconsistent with the due process requirement of the Fifth
Amendment." Johnson v. Robison, 39 L.Ed.2d 389 (1974).

Prisoners do not surrender their rights to equal protection at
the prison gate. See Williams v. Lane, 851 F.2d 867 (7th Cir. 1988).
If a legislative classification disadvantages a "suspect class" or
impinges upon the exercise of a "fundamental right", then the courts
will employ a "Strict Scrutiny" analysis and the statute must fall
unless the government can demonstrate that the classification has
been precisely tailored to serve a compelling governmental interest.

See <u>Clark v. Jester</u>, 100 L.Ed.2d 465 (1988).

A Strict Scrutiny standard must be applied to The Act's selective enforcement, because The Act impinges on Plaintiffs' fundamental First Amendment Freedom of Religion rights. Fundamental rights, infringement of which is subject to heightened and strict scrutiny under the Equal Protection Clause, include only those basic liberties explicitly, or implicitly, guaranteed by the United States Constitution.

"Equal Protection does not forbid classification; it simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike." <u>Nordinger v. Hahn</u>, 120 L.Ed.2d 1 (1992). Here, the governmental decision makers are treating differently persons who are in all relevant respects alike. No relevant difference exists between Free Felons who are not being forced to submit a DNA sample and the Incarcerated Felons who are.

No compelling, or legitimate, governmental objective exists to warrant the application of The Act to Incarcerated Felons, while not applying The Act to the otherwise similarly situated Free felons. Any difference between the Incarcerated and Free Felon is irrelevant.

"No state [or government] may effectively abdicate its responsibilities under the Equal Protection Clause . . . by either ignoring them or by merely failing to discharge them, whatever the motive may be." <u>Burton v. Wilmington Parking Authority</u>, 6 L.Ed.2d 45 (1961).

Plaintiffs demand the benefits of Equal Protection as applied to application of 42 U.S.C. §14135a. "Equal protection of laws is

application of 42 U.S.C. §14135a. "Equal protection of laws is something more than abstract right, and is a command which states must respect, benefits of which every person may demand." Hill v. Texas, 86 L.Ed 1559 (1942). Equal Protection commands equal application of §14135a.

If a compelling distinction can be made between Free and Incarcerated Felons regarding the collection of DNA, then logic dictates that a felon must be allowed to demand the destruction of the DNA sample once the Incarcerated Felon becomes a Free Felon.

The Act and Defendants' enforcement violate the Plaintiffs' Equal Protection right.

## H. Count 4 - 5th Amendment Violation

No person shall be compelled in any criminal case to be a witness against himself. See U.S. Constitution, Fifth Amendment. §14135a compels a person to prospectively "be a witness against himself" by submitting potentially incriminating evidence for crimes not committed, against his will. The constitutional guarantee against self incrimination must be accorded liberal construction in favor of the right it is intended to secure. See Hoffman v. U.S., 95 L.Ed 1118 (1951). See also Miranda v. Arizona, 16 L.Ed.2d 694 (1966).

The U.S. Constitution's Fifth Amendment privilege against self incrimination protects all American citizens, including prisoners, from being compelled to answer questions designed to "elicit information about existence of potentially incriminating evidence."

U.S. v. Hubbell, 147 L.Ed.2d 24 (2000). Being compelled by a §14135a
to submit DNA to law enforcement, for the purpose of matching it to
crime scene evidence, answers questions designed to elicit
information about the existence of potentially incriminating
evidence, and is a by-product of obedience to a regulatory
requirement.

Courts have limited the scope of the Fifth Amendment's
protections against self incrimination to "communicative evidence",
however, communication may be accomplished in writing, documents and
records. Invocation of a right against self incrimination must be
construed liberally and the "accused need not rely on any special
combination of words to invoke the right." Bradley v. Meachum, 918
F.2d 338 (2nd Cir. 1991)(cert denied 115 L.Ed.2d 1004 (1991)). A DNA
sample becomes "communicative evidence" when it is documented and
recorded to be used as incriminating evidence.

In Miranda v. Arizona, supra, the Supreme Court acknowledged
that "the Fifth Amendment privilege is available outside of criminal
court proceedings and serves to protect persons in all settings in
which their freedom of action is curtailed in any significant way
from being compelled to incriminate themselves."

Privilege against self incrimination not only extends to answers
that would in themselves support conviction, but likewise "embraces
those which would furnish a link in the chain of evidence needed to
prosecute." Malloy v. Hogan, 12 L.Ed.2d 653 (1964). Compelled DNA is
a link in the chain of evidence needed to prosecute.

The Act and Defendants' enforcement violate The Plaintiffs'
Fifth Amendment rights.

## I. Count 5 - 4th Amendment Violation

Requiring DNA collection violates the Plaintiffs' Fourth
Amendment rights under the Constitution of the United States.
Individualized searches must be supported by reasonable and
particularized suspicion and a warrant for their execution issued.
General warrants are anti-thematic to the American society. Common
rumor or report, suspicion, or even "strong reason to suspect" is
never adequate to support a warrant. See e.g., <u>Henry v. United
States</u>, 361 U.S. 98, 100-02 (1959).

Requiring Plaintiffs to submit to DNA testing is tantamount to a
blanket search. Blanket searches and seizures for investigatory
purposes subject unlimited numbers of innocent persons to
involuntary detention, intrusion and harassment. <u>Davis v.
Mississippi</u>, 394 U.S. 721, 726 (1969).

The existence of the Warrant Clause of the Fourth Amendment
underscores categories of searches "for which individualized
suspicion is nonnegotiable." <u>Veronia School District 475 v. Acton</u>,
515 U.S. 646, 673 (1995)(O'Connor, J. dissenting). The only
recognized exception to this general rule is when the search is
justified by "special needs, beyond the normal need for law
enforcement." <u>Indianapolis v. Edmund</u>, 531 U.S. 32, 37 (2000). No
need can be proffered which will justify the Fourth Amendment
exception. Four of the five Plaintiffs are over the age of 40 when
recidivism drops to 5%. All are non-violent offenders. No
suspicionless search is reasonable unless the "special need" is
divorced from the Government's general interest in law enforcement.

Common to the Special Needs Doctrine is that suspicionless testing cannot be allowed into the law enforcement perimeter or it violates the Fourth Amendment. In contradiction to the doctrine, 42 U.S.C. §14135a requires that a person convicted of any felony must submit blood for DNA analysis, the collection of which is performed by a law enforcement agency, the Bureau of Prisons, and turned over to a law enforcement agency, the F.B.I., for analysis and storage.

The Supreme Court is emphatic about suspicionless searches for law enforcement purposes. "We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." Indianapolis v. Edmond, supra, at 42-43.

The stated basis of the CODIS, DNA database is specifically driven by a law enforcement agenda.

> The purpose of this database is to match DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders. Clearly, the more samples we have in the system, the greater the likelihood we will come up with matches and solve cases." 146 Cong. Rec. H8572-01, *H8575-6.

The statute cannot fall within the special needs exception if the statute's primary purpose is the investigation and solving of crimes. The Act and the Defendant's enforcement of The Act violate Plaintiffs' fourth Amendment rights.

## J.   Request for Preliminary Injunction

Plaintiffs will suffer irreparable harm if Defendants are not enjoined during the pendency of this lawsuit from taking DNA samples

from Plaintiffs. Because the DNA Act is mandatory Defendants injury is irreparable to Plaintiffs. The injury is irreparable because once any DNA samples are taken from Plaintiffs, Plaintiffs' sincerely held religious beliefs would have been violated. Because the DNA Act is mandatory, Plaintiffs have no adequate remedy at law.

There is a substantial likelihood that Plaintiffs will prevail on the merits because any interest advanced by the Defendants to justify The Act will not outweigh Plaintiffs' freedom of religion, including the free exercise of Plaintiffs' religion.

The harm faced by Plaintiffs outweighs the harm that would be sustained by the Defendants if the preliminary injunction would not adversely affect public interest and public policy because the public has an interest in protecting religious freedoms in face of unconstitutional statutes such as the DNA Act.

Plaintiffs ask the Court to set their application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against the Defendants.

## K. Request for Permanent Injunction

Plaintiffs ask the Court to set the request for injunctive relief for a full trial on the issues and after the trial to issue a permanent injunction against Defendants.

## L. Jury Demand

## L. Jury Demand

Plaintiffs demand a trial by jury, pursuant to the Seventh Amendment of the United States Constitution and the Federal Rules of Civil Procedure.

## M. Conclusion

Wherefore, for these reasons The Act is unconstitutional and Defendants' enforcement of The Act to collect Plaintiffs' DNA violates Plaintiffs' fundamental Constitutional rights.

## Prayer

WHEREFORE, for these reasons, Plaintiffs ask for Judgment against Defendant for the following:

1. Declaratory judgment ordering or holding the DNA Act is unconstitutional.
2. Appointment of Counsel.
3. Injunctive relief.
4. Costs of court.
5. All other such relief to which Plaintiffs may be justly entitled.

26

Respectfully Submitted,

Russell Kaemmerling 04899-017
F.C.I.   SEA.   P.O. Box 9000
Seagoville, Texas   75159-9000

Ronnie G. Triplett 15692-064
F.C.I.   SEA.   P.O. Box 9000
Seagoville, Texas 75159-9000

Rodney S. Doggett #83059-080
F.C.I.   SEA.   P.O. Box 9000
Seagoville, Texas 75159-9000

Daniel R. Biler  # 10183-078
F.C.I.   SEA.   P.O. Box 9000
Seagoville, Texas 75159-9000

Brian Culwell   # 66552-079
F.C.I.   SEA.   P.O. Pox 9000
Seagoville, Texas 75159-9000

PLAINTIFFS PRO SE

27