RECEIVED

AUG 3 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RUSSELL KAEMMERLING, et. al,                 §
                                             §
        Plaintiffs,                          §
                                             §
v.                                           §        Case No. 06-1389 (RBW)
                                             §                    (JURY)
HARLEY LAPPIN, et. al,                       §
                                             §
        Defendants                           §

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION DISMISS
AND PLAINTIFFS' RESPONSE TO DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR TRO

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs respectfully file this opposition to Defendants' motion to dismiss and response to Defendants' opposition to our motion for injunctive relief. Because we have sufficiently stated a claim upon which relief may be granted, we ask the Court to deny Defendants' motion to dismiss. Alternatively, we ask the Court, if necessary, for any leave to amend as required. Further, we ask the Court to reject Defendants' opposition to our request for injunctive relief.

In support of this motion, we respectfully refer the Court to the attached memorandum of points and authorities.

WHEREFORE, We pray the Court deny Defendants' motion to dismiss and ask the Court to issue a temporary restraining order.

August 24th, 2006.                    Respectfully Submitted,


Russell Kaemmerling
Reg. # 04899-017
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Daniel Siler
Reg. # 10183-078
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159


Rodney Doggett
Reg. # 83059-080
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Brian Culwell
Reg. # 66552-079
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159


Ronnie Triplett
Reg. # 15692-064
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

RUSSELL KAEMMERLING, et. al,          §
                                      §
       Plaintiffs,                    §
                                      §
v.                                    §    Case No. 06-1389 (RBW)
                                      §         (JURY)
HARLEY LAPPIN, et. al,                §
                                      §
       Defendants                     §

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

We as Plaintiffs respectfully submit this memorandum of points and authorities in support of our opposition to Defendants' motion to dismiss and Defendants' opposition to our motion for injunctive relief.

## I. INTRODUCTION

1.    Plaintiffs are Russell Kaemmerling, Daniel Siler, Rodney Doggett, Brian Culwell and Ronnie Triplett, Evangelical Christians and federal inmates, incarcerated at F.C.I. Seagoville, Texas. Defendants are Harley Lappin, Director of the Bureau of Prisons, and Alberto Gonzales, United States Attorney General.

2.    We filed suit against Defendants for enforcing the DNA Analysis Backlog Elimination Act (DNA Act): and seek a declaratory judgment the DNA Act violates, inter alia, our sincerely held religious beliefs; a preliminary injunction; and a temporary restraining order.

3.    Defendants filed a motion to dismiss alleging failure to state a claim upon which relief can be granted. Defendants further oppose our motion for a temporary restraining order. We now file this opposition asking the Court to deny Defendants' motion and to grant the temporary restraining order.

## II. ARGUMENT

### A.    Standard of Review

4.    When considering Defendants' motion, the Court must construe the factual allegations in the complaint in the light most favorable to the Plaintiffs. Barr v. Clinton, 370 F.3d 1196 (D.C. Cir. 2004). Only if no possible construction of the alleged facts will entitle Plaintiffs to relief should the Court grant Defendants' motion. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). If the factual allegations in our complaint support any legal theory that entitles us to some relief, the Court should overrule Defendants' motion.

5.    This Circuit held in E.E.O.C. V. St. Francis Xavier Parochial School, 117 F.3d 621 (D.C. Cir. 1997), defendants must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (citing Conley v. Gibson, 2 L.Ed.2d 80 (1957). The Court further stated "we must accept all factual allegations as true, and draw all inferences in the plaintiff's favor." Id.    As this Court surely knows, 12(b)(6) motions are disfavored and civil procedure rules' pleading policies are liberally construed. Moreover, 12(b)(6) motions cannot be used to resolve factual issues or the merits of the case.    See Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995)(holding a motion to dismiss for failure to state a claim admits the facts alleged in the

2

complaint but challenges the plaintiff's right to any relief based on those facts).

6.       Defendants' motion correctly admits the facts stated in our complaint; therefore, among other things, Defendants admit the truth of our sincerely held religious beliefs and doctrine; nevertheless, they insist on arguing the merits. The issue is not whether a plaintiff will ultimately prevail but whether he is entitled to offer evidence to support his claims. See John Doe v. Hillsboro Independent School Dist., 81 F.3d 1395 (5th Cir. 1996). Defendants' motion (wholly conclusory) cannot withstand this significant standard. Applying the foregoing standard and the reasons stated below, the Court should deny Defendants' motion to dismiss because we have stated a claim upon which relief may be granted.

7.       At the outset, we ask this Court to note that Defendants' misguided Memorandum is utterly unpersuasive because it misquotes authority, incorrectly cites authority and is otherwise a morass of confusion. It is unpersuasive because most of Defendants' cited authority is simply not analogous to our case at bar.  Defendants, whom are presumably represented by able counsel, are not entitled to the liberal construction afforded by Haines v. Kerner, 404 U.S. 519 (1972). A review of our complaint, however, shows our complaint sufficiently alleged facts necessary to prove each element of our cause of action, including our claims unnder the RFRA.

8.       We allege the DNA Act and Defendants' enforcement of the Act violate, inter alia, our 1st Amendment freedom of religion rights and the Religious Freedom Restoration Act (RFRA). For religious claims, a plaintiff alleging a

3

violation of RFRA must demonstrate that his right to the free exercise of religion has been substantially burdened. 42 U.S.C. §2000bb-1(a). Once a plaintiff makes a threshold showing of a substantial burden on the right of free exercise, the government must demonstrate that the application of the burden to the individual furthers a compelling government interest("of the highest order") and uses the least restrictive means of furthering that interest. Jolly v Coughlin, 76 F.3d 468 (2nd Cir. 1996)[citing 42 U.S.C. §2000bb-1(b)].

B.    **Exhaustion of administrative remedies is not required because no administrative remedy exists**

9.    As a preliminary matter, Defendants ask the Court to dismiss our complaint for failure to exhaust administrative remedies. Defendants mischaracterize our complaint regarding administrative remedies stating, "Plaintiffs allege that it would be futile to pursue relief through the administrative procedures before filing this suit and therefore they were not required to do so." Defendants' motion at 5. We do not allege futility; indeed, our complaint conceded that pursuant to Booth v. Churner, 149 L.Ed.2d 958 (2001), the Supreme Court stated "we will not read futility in to statutory exhaustion requirements where Congress has provided otherwise." Accordingly, the Supreme Court held that "an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." Id.

10.    Defendants' contention that we must exhaust administrative remedies is erroneous. Moreover, Defendants' counsel has not been candid with this Court. (Attorneys have a duty of candor to a tribunal). In Booth, the Supreme Court also held "where the relevant administrative procedure lacks authority to provide relief or to take any action whatsoever in response to a complaint," exhaustion

is not required. <u>Booth</u>, at n. 4. Since there is no administrative rememdy here, exhaustion is not required.

11.    Defendants exclaim that under the Prison Litigation Reform Act (PLRA), "no action shall be brought with respect to prison conditions by a prisoner until administrative remedies are exhausted." Memorandum at 5. Ostensibly, Defendants believe whenever an inmate files suit, any suit, exhaustion is always required. Therefore, governmental defendants, as Defendants here, routinely claim any inmate suit must be dismissed for failure to exhaust. Defendants' contentions, however, ignore the law and ask this Court to disregard clear contrary case law, including <u>Booth</u>, supra.

12.    Our complaint is not a "prison conditions" complaint. Defendants correctly cite <u>Porter v. Nussle</u>, 534 U.S. 516 (2002) for the proposition that exhaustion requirement applies to inmate suits about prison life. We, however, do not challenge a prison condition, circumstance or occurrence. Instead, We challenge a statutory provison (DNA Act) that unconstitutionally violates our sincerely held religious beliefs. In <u>Padgett v. Donald</u>, 401 F.3d 1273, n. 7 (11th Cir. 2005), the Court clarified that <u>Turner v. Safley</u>, 96 L.Ed.2d 64 (1980) and its test did not stand for the government's claimed proposition because the case presented a challenge to a statute and not a prison condition.

13.    The Second Circuit noted the requirement in the statute that prisoners provide a DNA sample is not motivated by concerns for inmate safety and health, institutional order, or discipline. <u>Roe v. Marcotte</u>, 193 F.3d 72 (2nd Cir. 1999) As such, our complaint is not a prison conditions complaint for which the usual exhaustion requirement applies. (Defendants concede we challenge the

DNA Act's constitutionality) More compelling, however, is the Supreme Court's reasoning in Booth: "without the possibility of some relief, the administrative officers would have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." Id. Here, Defendants are devoid of **any** authority to provide any relief. There is simply no administrative remedy to exhaust. Instead, Defendants are statutorily bound to enforce the DNA Act against us and collect a DNA sample. After all, Defendants cannot declare the DNA Act unconstitutional. Because there is no remedy to exhaust, we are not required to pursue an administrative process; thus, the Court should deny Defendants' motion on this ground.

## C.   **The DNA Act violates our sincerely held religious beliefs.**

14.    Defendants argue the DNA Act is "religion neutral" and may be enforced even absent a compelling government interest, and therefore, we have failed to state a claim for denial of our First Amendment rights. Defendants' argument assumes too much. Even absent a compelling governmental interest, the DNA Act may still unconstitutionally burden our First Amendment rights.  As stated herein, Congress recognized such burdens in their findings when adopting the RFRA stating, "laws neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise.  Moreover, compelling governmental interest is only one factor in determining whether a statute impermissibly burdens someone's religious rights.  Finally, of course, because freedom of religion is a fundamental right, the Court must strictly scrutinize Defendants' claims and the DNA Act.

15.    Although Defendants cite Shaffer v. Saffle, 148 F.3d 1180 (10th Cir.

6

1998) for the stated proposition of "religion neutral" laws, Defendants misattributes the Supreme Court's holding to Shaffer. In Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872 (1990), the United States Supreme Court held religion neutral laws generally do not violate the Free Exercise Clause even if they "incidentally affect religious practices." Primarily, it seems Defendants contend that because the DNA Act is "religion-neutral," we have not stated a claim. Defendants' reliance is misplaced. In any event, that a law is "religion-neutral" and the government need not possess a compelling interest does not end the inquiry, it merely changes the focus of the inquiry. The Court is still required to engage in a balancing analysis. Additionally, Defendants completely ignore the mandates of Congress' findings which include recognizing an act may still impermissibly burden a person's religion despite being "religion-neutral."

16.    Using as a shield the "incidentally affecting religious practice" excuse to extend to DNA sampling is also spurious. Although couched as "religion-neutral," the DNA Act is hardly "incidental" to our religious beliefs. We would be required to disavow a strongly held central tenet of our religious beliefs. We would have no option. It is either comply or be forced. A more incidental affectation as the result of a religious neutral law example is when a person must park in a different location due to a zoning change and walk an extra block to church. The Government cannot be allowed to choose the terms; create its own definitions; and then create law to match this new Orwellian double-speak. When that happens it is always at the expense of fundamental liberties.

17.    Clearly, therefore, we have sufficiently stated facts that establish the DNA Act violates our sincerely held religious beliefs. We have stated a claim

7

upon which relief may be granted; therefore, the Court should deny Defendants' motion to dismiss.

D.   **The DNA Act violates the Religious Freedom Restoration Act (RFRA).**

18.    The RFRA, a vitally important statute, was passed following the U.S. Supreme Court's holding in Employment Division v. Smith, 494 U.S. 872 (1990). In passing the RFRA, the Congress found that

> (a) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;
>
> (b) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;
>
> (c) governments should not substantially burden religious exercise without compelling justification;
>
> (d) Smith, supra virtually eliminated the requirement that the government justify burdens on religious imposed by laws neutral toward religion; and
>
> (d) the compelling interest as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

42 U.S.C. §2000bb-(a)(1-5).

Substantial Burden

19.    The purposes of the RFRA are to restore the compelling interest test and to guarantee its application in all cases where the free exercise of religion is substantially burdened; and to provide a claim or defense to persons whose religious exercise is substantially burdened by the government. 42 U.S.C. §2000bb-(b) Against this backdrop, Defendants concede under the RFRA, as they must, the Government may not substantially burden a person's exercise of religion

unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §2000bb-1(a)(b).

20.    Shockingly, Defendants slander and mischaracterize a central tenet of our sincerely held religious beliefs. Defendants claim the "crux of our objection to DNA sample collecting appears to be that they fear submitting to DNA sampling, collection and storage with no clear limitations of use." Memorandum at 7. Defendants' contention is baseless; indeed, it is offensive to our sincerely held religious beliefs. We passionately believe the very act by the Government taking our DNA ("the building blocks of life") substantially burdens our sincerely held religious beliefs.    Moreover, Defendants' arguments are inappropriate for a 12(b)(6) motion, because factual assertions are accepted as true. Emphatically, however, we nonetheless accept this challenge for we fervently believe our religion forbids the taking of our DNA.

21.    The taking of our DNA, in and of itself, is the act that substantially burdens our sincerely held religious beliefs. As the Apostle Paul warned, "don't you know that you yourselves are God's temple and that God's spirit lives in you?" 1 Corinthians 3:16. We have an absolute responsibility therefore, as enunciated by the Apostle Paul to offer our bodies as living sacrifices, holy and pleasing to God, all of which is our spiritual act of worship. It is totally repugnant to our religious beliefs requiring us to defile God's temple, as represented by our mortal bodies in giving DNA.

22.    It is true that our complaint also addresses legitimate concerns about governmental abuses. While the Crime Control Act attempts to limit disclosure of

DNA sampling results, Defendants, however, trivialize and misstate our concerns. Emphatically, Defendants' argument ignores the point of a central tenet of our sincerely held religious beliefs. In addition to violating our bodies as Temples of God in taking our DNA, we strongly believe in the Bibilical prophesies that foretell, among other things, the rise of a world rule commonly referred to as the Anti-Christ. The Anti-Christ will exercise control over the entire population to the point of controlling the purchase of essential commodities, i.e. food, and the "bodies and souls of men." See Revelation 18:13.

23.    We unequivocally believe that forcing us to provide DNA samples is tantamount to the laying of the foundation for the rise of the Anti-Christ. Furthermore, as each DNA sample will be assigned a unique identification number, providing a DNA sample to the government ruler is comparable to taking the "mark of the beast" as Biblically prophesied. Unquestionably, therefore, our sincerely held religious beliefs do not allow us to consent to DNA sampling. As such, the DNA Act substantially burdens our sincerely held religious beliefs.

24.    Our sincerely held religious beliefs are absolutely not based on "false grounds" as alleged by Defendants.  Defendants' arrogance is an unconscionable assault on our fervently held beliefs. Clearly denigrating our faith, Defendants state we "claim" we are Evangelical Christians who profess a belief in Jehovah God as Sovereign in the Universe.  We did not find religion after coming to prison; rather, we have been dedicated Christians for many years. (While we all practice our deeply-held faith, notably, Russell Kaemmerling also holds a Master of Divinity Degree from the largest Evangelical seminary in the world)

25.    Contending our beliefs do not amount to a "central tenet" is also

insulting. Incredibly, Defendants launched an shameless attack on our religious rights by saying "DNA . . . violates neither Plaintiffs' religious freedoms nor their Constitutional rights." Memorandum at 2. Under Defendants' reasoning, our religious freedoms are not even afforded Constitutional protection for they claim religious freedoms are not Constitutional rights. We realize Defendants' counsel may have inadvertently mischaracterized our rights. In light of their other blatant attacks on our faith, we believe their actions were purposeful.

22. While Defendants correctly cite Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997) for a discussion of, among other things, "central tenet," Defendants attempt to misdirect this Court's attention away from one of the real doctrinal basis of our religion regarding this fundamental issue as discussed below. Further, Judges are not oracles of theological verity. Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025 (3rd Cir. 1982).

23. Defendants' misread Weir and their memorandum fails to adequately explain a court's ruling. In Weir, the 8th Circuit explained what constitutes "substantial burden." The Court stated "to be considered a substantial burden, the governmental action must significantly inhibit or constrain conduct or expression that manifest some central tenet of a person's individual beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person's reasonable opportunities to engage in those activities that are fundamental to a person's religion." Id.

24. Under Weir's approach and related case law, it is clear the enforcement of the DNA Act substantially burdens our sincerely held religious beliefs. A central tenet of our religious beliefs commands we not violate our bodies, as

11

living temples of God, in giving DNA samples. The choice the DNA Act demands is either voluntarily submit to DNA collection which would violate our sincerely held religious beliefs or adhere to those beliefs and be compelled to submit to DNA collection, again burdening our rights. Either way, there is no choice; our sincerely held religious rights are substantially burdened. By enforcing the DNA Act, we are completely denied all opportunity to engage in our sincerely held religious beliefs.

25.      Clearly, our complaint states the seizure or our blood to build a DNA databank (CODIS) violates our deeply rooted religious convictions. The DNA Act leaves us no choice. It is either sacrifice these strongly held beliefs or have them blatantly violated. That is no choice at all. Therefore a substantial burden on our beliefs occurs. It would deny us the ability to express adherence to our faith and deny all opportunity to engage in activities fundamental to our evangelical faith. See Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir. 1995).

26.      Under Defendants' approach, this Court could permissibly question the authenticity of our sincerely held religious beliefs, however, it is inappropriate for a reviewing court to attempt to assess the truth or falsity of an announced article of faith. See Africa, 662 F.2d at 1030 (holding Judges are not the oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy).

27.      Because our religious beliefs forbid giving any DNA sample, regardless of the means used to obtain a DNA sample, and the DNA Act contains no exceptions, the Act substantially burdens our sincerely held religious beliefs.

Compelling Governmental Interest

28.    Our complaint establishes the DNA Act substantially burdens our religious beliefs. Under the RFRA, the burden shifts to Defendants to establish a compelling governmental interest and the least restrictive means are used to advance those interests.    For this reason alone, the Court should deny Defendants' motion to dismiss. We are entitled to present evidence to support our well-taken complaint. Furthermore, a 12(b)(6) motion cannot be used to resolve factual disputes.    While Defendants argue there exists a compelling governmental interest, the fact remains, their motion to dismiss is baseless.    (Compare a motion for summary judgment--discovery completed or an adequate time for discovery to have been completed)

29.    Defendants reason because the DNA Act's "main" purposes are "identification" and "to solve crimes, past and future," the purposes are a "compelling governmental interest."    We understand the Government, on the public's behalf, has a legitimate interest in solving crimes. We, however, strongly dispute the DNA Act (CODIS databank) is fundamentally and compellingly necessary to achieve the stated governmental interest. The stated purpose for "identification" is not compelling. We can all easily be definitively identified by ordinary and real fingerprints. Indeed, such means of identification has worked successfully for over a century. Suddenly, it seems, because technology has changed, the Government can no longer adequately identify suspects? The Government's assertion is completely disingenuous. Additionally, the DNA "fingerprint," as Defendants proudly exclaim, has the real potential for abuses as set forth herein. Those abuses directly violate our deeply held religious beliefs. We are not allowed to give our DNA for "Identification" purposes because

13

of our beliefs in Biblical prophesies forbids it.

30.    The Government's policy is not insulated from scrutiny merely because Defendants brandish the concept of public safety and law enforcement, As the RFRA's history suggests, the connection between the application of a policy to an individual and the furtherance of the government's goals must be clear. "[P]olicies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirement." See Jolly v. Coughlin, supra.

31.    None of us committed violent crimes. None of the cases turned on DNA evidence and the Government was able to sufficiently identify us.  A least restrictive means of accomplishing the same end exists through fingerprinting which does not violate our religious faith.

32.    With no compelling law enforcement advantage a balance must be struck, In Re Tessier, 190 BR 396, 399 (Bankr. D. Mont 1995). The Tessier Court concluded that the government's interests, although "rational and even important" were "not sufficiently grave to deserve the compelling label when balanced against a parishioner's free exercise of religion." Here, although Defendants' claimed interests and rational and important, when balanced against a fundamental religious right, the interests are not compelling.

33.    Defendants argue that there is a "compelling governmental interest and that seizing DNA samples provides the least restrictive means of furthering that compelling governmental interest. (See Defendant's Memorandum at page 5). Other governmental practices have been ruled as compelling. For example, interest in

maintaining the tax system, Hernandez v. Commissioner, 490 US 680, 699 (1989); interest in compelling participation in the Social Security System, United States v. Lee, 455 US 252 (1982); Wisconsin v. Yoder, 406 US 205 (1972) held that the government has a compelling interest in providing public education.

34.    In each example above, there exists a viable optional alternative. Indeed, arguably, because an alternative existed, the Court found the government had a compelling interest. The alternatives included non-profit tax-exempt organizations which existed to provide a means to avoid unconscionable tax imposition; allowing one to register as a conscientious objector and avoid Social Security participation, or work at a government job to accomplish the same end; and approving private schools and home-schooling exist to provide an alternative to government controlled schools. The DNA Act compelling Defendants' enforcement of the seizure of our DNA leaves no alternative for us at all.  Therefore, while a legitimate interest exists, it can hardly be said to be compelling since the purposes of the Act can be easily  and adequately obtained through other means.

Least Restrictive Means

35.    Assuming the Governments' interest under the DNA Act is compelling, the Government bears the burden of showing they use the least restrictive means in furthering that purported compelling interest. The Government cannot satisfy this exacting standard. The Government's stated "compelling interest" is law enforcement needs; mainly that collection and storage of our DNA samples would improve "identification" and the ability to "solve past and future crimes."

36.    Clearly, the Government has not chosen the least restrictive means to

15

further their alleged compelling interest. Unquestionably, collection of DNA samples is the most restrictive of personal liberties and destructive of fundamental rights such as religion and privacy. To be clear, it is not the means of seizing our DNA sample we find objectionable, but the very act of taking it. Therefore, Defendants' reliance on "Schumer" is misplaced. [Defendants cite "Schumer" but likely intended Schmerber v. California, 384 U.S. 757 (1966). They also incorrectly cite page 777, a dissenter, for their stated proposition. We point out the correct page is 771]

37.    In any event, we reiterate, it is not the means, however "minimal" that count for least restrictive means analysis. Once again, Defendants' counsel demonstrates their lack of knowledge and understanding on this issue. Clearly, "least restrictive means" requires the Government to use the least restrictive means in advancing their purported compelling interest. Defendants reason the Government's compelling interest is "identification" and "solving crimes." The least restrictive means in advancing those interests (to avoid violating the RFRA and our religious rights) are real fingerprints. While not perfect (neither is DNA technology), regular fingerprinting has worked successfully for many decades in both identifying suspects and solving crimes. One need only look at the vast numbers of people incarcerated as examples of fingerprints' strengths. That taking DNA (and blood) is "commonplace these days" and "involves virtually no risk, trauma or pain," is not dispositive.

38.    As stated, the Government can use other less restrictive means (i.e. real fingerprinting) to advance its law enforcement interests. That we never achieved 100% law enforcement efficiency is not a compelling reason to abandon honoring fundamental liberties and privacy rights. After all, if law enforcement

efficiency was the only important objective, we could achieve 100% results. Judge Hawkins summarized this issue well saying, "[i]n a world unrestrained by our 4th Amendment, every citizen, convicted or not, might be forced to supply a DNA sample. More crimes would undoubtedly be solved, just as would be the case if there were not warrant requirements. But that is not the world that Mr. Madison and the First Congress created for us." Kincade v. United States, 379 F.3d at 876. Moreover, DNA technology is hardly infallible. for example, a person who receives a bone marrow transplant actually receives the blood DNA of the donor yet retains his own DNA in his hair and skin, and recently, a paternity suit revealed a child born will not necessarily reflect his/her mother's DNA. Finally, of course, the human error element has been and will always be extremely significant.

39.    Because, the DNA Act substantially burdens our firmly, sincerely held religious beliefs; the Government's interests are not compelling, or assuming a compelling interest, the Government does not use the least restrictive means in advancing those interests. As such, we have sufficiently stated a claim upon which relief may be granted; therefore, the Court should deny Defendant's Motion to Dismiss.

### e. The Collection of Plaintiffs' DNA Violates the Fourth Amendment.

40.    While we concede there is a substantial body of case law upholding DNA collection challenged under the 4th and 5th Amendments to the U.S. Constitution, (Courts differ on analytical framework.) there exists privacy concerns not adequately addressed by these same courts. Accordingly, we have stated a claim in this area.

41.    As technology increases, the realm of personal privacy shrinks. See Kyllo
v. United States, 533 US 27 (2001). Regarding DNA technology, DNA collection can
easily be used for more than merely identification purposes. Indeed, Defendants
concede as much, for all throughout their Memorandum. Defendants refer to "DNA
testing." Implicit in Defendants' arguments are the Governmental use of our DNA
for "testing" purposes and not merely collection and storage. In fact, even the
Office of Technology Assessment of the U.S. Congress has warned the possibility
exists to test DNA for not only identification purposes, but for disease
information and genetic information.


42.    Defendants, resort to procedural "Three card Monte" efforts to persuade the
court to dismiss Plaintiffs' complaint. Defendants state "The Crime Control Act
limits the disclosure of the test results to criminal justice agencies for law
enforcement identification purposes, for use in judicial proceedings and for
criminal defense purposes to defendant." However, 42 U.S.C. §14132 also states in
part:

> pursuant to rules that allow disclosure of stored DNA samples and DNA
> analyses only--
>
> (D) if personally identifiable information is removed, for a population
> statistics database, for identification research and protocol
> development purposes, or for quality control purposes.

Apparently Defendants would wish the court to believe that it should be as
inconsequential as it is anonymous, that there is no latitude in definitions of
such terms as "protocol development purposes", or even that the efficiency of some
low level government bureaucrat to remove identification information before
transmission should be assumed. This reasoning is misdirected.


43.    DNA sampling contains a host of private information well beyond
identification. There are no compelling reasons for the government to collect such

private information. If "identification" is the purpose, ordinary fingerprinting has been more than sufficient for law enforcement purposes for over a century.

44.    The collection of DNA represents an alarming trend whereby the privacy and dignity of citizens are being slowly taken by imperceptible steps. Taken individually, each step may be of little consequence. When viewed entirely, however, there begins to emerge a society unlike we ever envisioned where the government may intrude into private matters at will. See Osborn v. United States, 385 US 323 (1966). Defendants invite this Court to accept this "one-step-at-a-time" approach in robbing us and other citizens alike of their personal privacy. Thomas Jefferson once warned "the time to guard against corruption and tyranny is before they shall have gotten hold of us. It is better to keep the wolf out of the fold than to trust drawing his teeth and talons after he shall have entered." Thomas Jefferson, "Notes on the State of Virginia 121" (William Peden ed.. 1955). Jefferson's emphatic words ring true today in DNA sampling and collection.

45.    If law enforcement efficiency were the only paramount interest, then we could simply forfeit all liberties and rights. However, such surrender would vacate the very basis of this Country's fundamental belief. "They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety." Benjamin Franklin, "Historical Review of Pennsylvania" (1759).

46.    For example, the government could conveniently choose to abandon the Fourth Amendment requirement of probable cause and stop every car on the highway to administer a breath analysis test to its driver. This could virtually eliminate drunk driving, but at what cost? The Bill of Rights is a restraint on government power. There has always been a trade-off, a balance between individual liberties

and governmental intrusion. In a world unrestrained by the Fourth Amendment, every citizen, convicted or not, might be forced to supply a DNA sample. Some in law enforcement are already advocating the taking of a DNA sample of all babies born in the U.S. at birth and having it logged into CODIS. If this came about, more crimes would undoubtedly be solved, just as would be the case if there were no warrant requirements. Hitler's Gestapo was tremendously effective at curtailing crimes (together with freedom of expression, right to vote, due process, search and seizure and right of assembly.) But that is not the world that Madison and Jefferson envisioned and not the one the First Congress created for us.

47.    Just as the Fourth Amendment is the citadel to guard against unwarranted and unnecessary intrusion into our personal lives, the First Amendment stands to guard against the unwarranted and unnecessary intrusion into our religious life. One Amendment like the other, should be interpreted "as broad as the mischief against which it seeks to guard." Counselman v. Hitchcock, 142 U.S. 547 (1892).

48.    To suggest it will be "safe" in the hands of the government who will only use it for good should render deaf the ears on any intelligent U.S. citizen who need only look back a few weeks to remember 26 million of our military, past and present, and their families, whose personal information was stolen (including that of Plaintiffs Doggett and Siler) from a government employee who routinely took it home as a matter of convenience.

49.    A land in which everyman becomes a law unto himself becomes a rich breeding ground for anarchy and the rule of law upon which Western Civilization is built must prevail. However, unchecked governmental power breeds totalitarianism and the constant vigil to the maintenance of a vital democracy is the balance between the

two.

50.    The Honorable Judge Reinhardt, dissenting in United States v. Kincade, 379 F.3d 813 (9th Cir. 2004), observed this alarming trend saying, "[t]oday this court approves the latest installment in the Federal Government's effort to construct a comprehensive national database into which basic information concerning American citizens will be entered and stored for the rest of their lives--although no majority exists with respect to the legal justification for this conclusion."

51.    It has been said, "The road to hell is paved with good intentions." When democratic values are lost, society often looks back, too late, and says "when did this happen?--Why didn't we understand before it was too late?" Justice Brandeis once wrote, "It is immaterial that the intrusion was in the aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning, but without understanding." Olmstead v. United States, 277 US 438 (1928). Defendants are either incredibly naive or willfully ignorant when it comes to understanding the loss of liberty or privacy.

52.    Like so many other "good intentions," DNA sampling and collection represents the latest well-intentioned effort by the Government. Government initially desired to collect DNA sampling of sex offenders and murderers. It is hardly surprising that no one objected to the Government's initial use, however, we have learned the Government has not limited DNA sampling to such offenders.

53.    Today, in many jurisdictions, one need not have even been convicted for the Government to seize a person's DNA, unbelievably, from "third-parties." As recently as August 22, 2006 in that day's edition of USA TODAY, (Plaintiffs request the Court take judicial notice of the August 22, 2006 issue of USA TODAY.) in reporting on CODIS, described it by saying, "The system solves crimes by matching genetic profiles drawn from blood, semen and other forensic evidence to a database of convicted criminals and other people who have been arrested." (The article further shows the excesses of its use when it quotes Denver District Attorney Mitch Morrisey's attempt to justify the potential problems of DNA mismatches when he says, "Law enforcement always is investigating people who are later proven to be innocent and exonerated." When did the burden of proof shift to proving innocence rather than the government proving guilt?) Is there no end in sight? When will the public, and the courts, demand reasonable limits consistent with our personal rights of privacy and liberty? Fortunately, there are still courageous judges like Reinhardt, Kozinski and Hawkins who represent the high ideals and principles upon which this Country was founded, however, a rally cry to battle is a paramount need.

54.    Judge Reinhardt foretold, "[m]y colleagues claim to authorize merely the compulsory DNA profiling of certain conditionally-released federal offenders, as authorized by the DNA Act. We would be lucky indeed if it were possible to so limit the effect of their opinions. For under the rationales they espouse, all Americans will be at risk, sooner rather than later, of having our DNA samples permanently placed on file in federal cyberspace and perhaps, even worse, of being subjected to various other governmental programs providing for suspicionless searches conducted for law enforcement purposes." Judge Reinhardt's prophetic words are sadly coming true as few courts have made the courageous rulings to keep

the system in "balance."

55.    Judge Reinhardt recalled days of J. Edgar Hoover terrorizing civil rights leaders, the Palmer Raids, and roundup of Japanese Americans all because of inherent dangers of government programs. He noted, "even governments with benign intentions have proven unable to regulate or use wisely vast stores of information they collect regarding their citizens." Id. He reasoned, "the bureaucracy most often in charge of the private information is poorly regulated and susceptible to abuse." Id. The recent event with the Veterans Administration neglecting the security of 26 million veterans, as previously discussed, illustrates this problem. To allow such private DNA information to be collected from non-consenting citizens runs contrary to the values on which this country was founded.

56.    Balancing test (whether "special needs" or "totality of circumstances") does not provide much balance. "Balance" always seems to tilt in the Government's favor. "There have been powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give police the upper hand." Terry v. Ohio, 392 US 1 (1968). Judge Reinhardt reasoned the system has "already buckled under the pressures to strengthen the hand of law enforcement; it will only worsen as the 'war on terror' demands more." Id.

57.    Judge Reinhardt also stated, "It is undoubtedly true that were we to maintain DNA files on all persons living in this country we would make the resolution of criminal investigation easier." Id. but, the same would be true were we willing to sacrifice all of our interests in privacy and personal liberty. "Those who won our independence chose not to follow that course but instead to provide us with safeguards contained in the 4th Amendment. We judges do not have

the authority to sacrifice those constitutional protections." Id. Law enforcement
is not the only interest that matters.

58.    Judge Kozinski expressed in Kincade the problem inherent in most court's
"balancing tests" saying, "I'm hard pressed to see how this would violate anyone's
4th Amendment rights. The benefits would continue to be huge. The more DNA samples
are included in the database, the better off we are; more guilty parties will be
found, more innocents will be cleared, and more unknown crime victims will be
identified. On the other side, the costs will be meager . . . perhaps my
colleagues believe it's invevitable given the dangers of modern life. But I mourn
the loss of anonymity such a regime will bring." Kincade, 379 F.3d at 872-873.
When the inevitable expansion comes, "we will look to the regime we approve today
as the new baseline and say, this too must be OK, because it's just one small step
beyond the last thing we approved." Id.

59.    CODIS' potential for expansion is not limited to the population of
convicted federal offenders. Indeed, Judge Reinhardt noted that CODIS also
contains profiles of individuals who have been convicted of no crime whatsoever,
but merely had the misfortune of being arrested in Louisiana, Texas, or Virginia."
Id. He also warned that before too long CODIS will include profiles from
misdemeanants, arrestees and other suspected criminals throughout the nation. See
also, Mark Hansen, DNA Dragnet, ABA Journal, May, 2004, at 43 noting that Congress
is soon likely to approve legislation authorizing DNA profiling of juvenile
offenders and adult arrestees. Once those steps are made, as Judge Reinhardt
reasoned, "there will be undoubtedly pressure to expand the database even further
to include profiles of individuals who wish to obtain drivers license, or federal
passports, applicants for federal jobs, or admissions to public universities,

children who attend public schools, all newborns, and ultimately, the entire population." Id.

60.    The so-called DNA "fingerprint" entered into CODIS likely has potential to reveal information about an individual's genetic defects, predispositions to diseases, and perhaps sexual orientation. See Harold J. Krent, "Of Diaries and Data Banks: Use Restrictions Under the fourth Amendment." 74 Tex. L.Rev. 49, 95-96 (1995). Again, Judge Reinhardt: "To say that CODIS profiles might actually be used for such purposes is hardly far-fetched." Id. See also 42 U.S.C. 14132(b)(3)(D) (allowing for a number of other uses).

61.    The Government seeks to justify DNA collection solely because a DNA sample will be available in the CODIS database for the rest of that person's life. Judge Kozinski stated, "As a practical matter, the chance Kincade could have his DNA removed from CODIS once he completes his supervised release is about the same as the chance that some arrested and fingerprinted, but eventually found innocent, could force the FBI to delete his fingerprints from its database, namely nil." Id. The time to put the cork back in the brass bottle is now--before the genie excapes. Enforcing the Constitution is neither a popularity contest or a polling exercise.

62.    Because of the foregoing the complaint sufficiently states a claim and the Court should deny Defendant's Motion to Dismiss.

## f. The DNA Act Violates the Equal Protection Clause

63.    The Equal Protection Clause, or more precisely the Equal Protection

component of the Fifth Amendment's Due Process Clause does not require that all persons everywhere be treated alike. It does, however, impose a requirement that government not treat similarly situated individuals differently without a rational basis. See Cleburne v. Cleburne Living Center, Inc., 437 US 432 (1985).

64.    A violation of the equal protection clause occurs only when the government action in question classifies or distinguishes between two or more relevant persons or groups. "The government decision . . . from treating differently persons who are in all relevant aspects alike." Nicholas v. Tucker, 114 F.3d 17 (2nd Cir. 1997)(internal citations omitted.)

65.    The DNA Act as administered distinguishes between "free felons (those who have served their time and are no longer under the constraints of the BOP or court supervision) and those who are incarcerated, on parole or supervision, and who are required to submit to DNA seizure. If the Act's intent is law enforcement as alleged and if as alleged a higher degree of felons commit criminal acts and have been in the past more likely to have been responsible for unsolved crimes, then it begs the question: Why is the distinction between "free felons" and "supervised" felons made.

66.    Requiring the seizure of DNA from one set of felons while not requiring it from all felons violates the Equal Protection Clause of the Fifth Amendment. There can be no reasonable basis postulated or governmental interest distinguished requiring DNA seizure from one group of felons and not requiring it from all. Yet, Defendants call for just such "one-step-at-a-time" approach claiming there is no equal protection violation in seizing DNA samples from certain felons while not taking DNA from "free" felons.

67.     Unquestionably, we have stated a claim upon which relief may be granted, and the Court should deny Defendants' motion to dismiss.

G.     **The Court should grant the requested injunctive relief.**

68.     Defendants claim that we cannot demonstrate a substantial likelihood of success on the merits. They arbitrarily claim we cannot show **any** likelihood of success. Memorandum at 13. Further, Defendants argue we will not suffer irreparable harm and we cannot demonstrate our significant harm outweighs harm to the Bureau of Prisons; thus, the Court should deny our motion for injunctive relief. It is clear, however, Defendants make conclusory allegations without any factual support. What little factual support Defendants include is totally irrelevant: 1) Crow's "declaration" is not persuasive; and 2) Defendants refer to one "Irby" Decl. at ¶ 5" in their Memorandum at page 14. We have been unable to locate any "Irby" Declaration or its significance.

69.     In any event, Defendants do correctly recognize the balancing test in considering injunctive relief is a "flexible one." See Population Institute v. McPherson, 797 F.2d 1062 (D.C. Cir. 1986). While preliminary relief is an extraordinary form of relief, there is a substantial likelihood that we will prevail on the merits when the case is tried.

Success on the Merits

70.     This Circuit has held to obtain injunctive relief, a party need not establish an absolute certainty of success: "it will ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so serious,

substantial, difficult as to make them a fair ground for litigation and thus for more deliberative investigation." Population Institute, supra. Under the above standard and reasons herein, we have demonstrated there is a substantial likelihood of prevailing on the merits of our complaint. Certainly, we have shown a strong likelihood of prevailing on our religious claims and equal protection claims. Given the flexibility of the balancing test this Court should grant the injunction.


Irreparable Harm


71.    Under Armstrong v. Bush, 807 F.Supp. 816 (D.C. Cir. 1992), the harm, in an injunctive relief context, must be immediate, irreparable and not speculative. Because we are not "scheduled to undergo DNA testing," Defendants' non-sequitor line of reasoning contend there is no "impending harm befalling Plaintiffs at this time." Memorandum at 13. Defendants rely on Scott Crow's declaration in which he claims to "have access to Federal Bureau of Prisons' records" and "none of the Plaintiffs are currently scheduled for release within one year from today."


72.    While Defendants claim Crow stated that it is the "policy" of FCI Seagoville to schedule the collection of DNA samples from inmates approximately one year before their release from custody or transfer to a halfway house, Crow's declaration set forth no such policy. Notwithstanding Crow's assertion that he schedules the collection of DNA samples from inmates approximately one year before their release, F.C.I. Seagoville obtains DNA samples from inmates at any time.

73.    The contention we will not be irreparably harmed because the proposed harm is not "immediate" is erroneous. **At any time,** BOP and F.C.I. Seagoville can obtain our DNA. Moreover, we may easily be transferred from F.C.I. Seagoville and reassigned. In fact, we all, save Ronnie Triplett, are "camp" eligible. As such, other institutions procedures may require the DNA sample be seized immediately. Additionally, F.C.I Seagoville may seize the DNA sample before the transfer is effected. Therefore, Defendants' contentions are completely without any merit.

74.    That "none of the us are currently scheduled for release within one year of today and none are scheduled for a DNA sample collection does not establish the lack of immediate harm.  No harm at this time? We do not have the luxury of driving up to the courthouse's steps at any time on the eve of threatened harm. (Nor do we have access to any electronic means of filing pleadings) The time to seek protection is now. We can not afford to wait until the last minute in seeking protective injunctive relief. Furthermore, our experience with the Government has taught us the Government will try and block our access to court at every juncture. [See Rodney Doggett, et. al vs. Alberto Gonzales, et. al, 06-0575(RBW) denial of access to court lawsuit]   Our concerns, therefore, are reasonable and harm is immediate and irreparable.

75.    Crow claims to have access to all sorts of "records," yet missing from Crow's declaration and Defendants' memorandum is any mention of pending litigation regarding our sentences.      Plaintiff Daniel Siler (whom Defendants incorrectly state was convicted of distribution of marijuana) has an appeal pending regarding the Government's breach of the plea agreement. In all fairness, Daniel Siler will likely prevail on the breach of plea agreement issue and specific performance of the plea agreement will be ordered. The resulting amended

judgment will reduce Daniel Siler's sentence by thirty (30) months. Other named plaintiffs likewise have appeals or related challenges that will likely reduce their sentences significantly. Therefore, since we face DNA sampling collection at any time, irreparable harm exists.

76.      We invite the Court to scrutinize Defendants' disingenuous arguments regarding harm to us and alleged harm to Defendants. Defendants argue there is no irreparable harm to us because we have not yet been scheduled for DNA collection. Since Defendants contend that F.C.I. Seagoville has not scheduled any of us for DNA collection, F.C.I. Seagoville certainly would not be harmed by the Court granting the injunction. Indeed, Defendants essentially concede a tacit agreement not to obtain a DNA sample from us. On the other hand, however, Defendants argue that they will be harmed if ordered or restrained by the Court not to take any DNA samples from us. Finally, the litigation of this matter could easily take several months, if not one to three years (trial and all appeals by either party); accordingly, Defendants' contention we will not suffer harm is disingenuous.

## Balancing Hardships

77.      Defendants claim the BOP will be harmed if the Court grants the injunctive relief, claiming that if we are granted a TRO (notably, Defendants concede the strength of our religious based objections), other inmates would "also undoubtedly claim that their religious principles (even if not sincerely held) would be violated by the DNA Act and also seek TROs." Memorandum at 14. Defendants' concerns are greatly exaggerated. As Judge Parker stated, "the world is not going to cave in if I grant a temporary restraining order." See Armstrong

v. Bush, 807 F.Supp. 816, 821 (D.D.C. 1992) Further this Court can narrowly tailor the injunctive relief for us and adequately address any litigation by any future parties at the appropriate time.

78.     The notion injunctive relief would be "especially detrimental because the BOP will not be able to effectively perform its obligation under the DNA act in regards to other felons" is completely baseless. Provided this Court grants the TRO and we later prevail on the merits, Defendants, including the BOP, would not have any obligation to collect DNA samples. No such burden would fall upon the BOP. Furthermore, with regards to other felons, the BOP would still be free to carry out its obligations under the DNA ACT and collect samples from those felons.

Public Interest Favors Granting the Injunction

79.     Although Defendants point out the DNA ACT was created with "the government's duty to the public in mind," (Memorandum at 14) the public's interest also favors granting the requested injunction. The public has a strong interest in upholding religious freedoms. Indeed, freedom of religion, chief among the constitutional rights, is the First Amendment of the Constitution. As such, our forefathers placed special emphasis on this fundamentally important right. Fortunately, Congress recongized religious importance in its findings when passing the RFRA.

80.     Defendants speculate restraining DNA collection from the five inmates may thwart the preventing and solving of past and future crimes. Memorandum at 14. Defendants' contentions are unpersuasive, conflicting and misplaced. (Using the

Defendants' flawed logic one should expect the collecting of DNA to solve such law inforcement mysteries such as who was on the grassy knoll, what happened to Jimmy Hoffa and who really was Jack the Ripper.)

81.     The question of a "complete interest" test the government must demonstrate is "an interest of the highest order." Church Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 US 520 (1993). A simple statement of public safety and law enforcement is at least sophistic. Four of us are over the age of 40 where recidivism drops below 5% making us no more likely to commit a crime than the general population. [We also hold post-graduate degrees. (Daniel Siler, J.D.) Higher Education reduces recidivism even further.] In any event, none of us have ever been convicted of any violent felony offenses. (Most of us are first time offenders) While the Defendants can articulate a governmental interest for collecting the DNA, it does not follow the requested injunctive relief during the pendency of this litigation would harm the public. To the contrary, the public has a strong interest in ensuring the constitutionality of statutes; especially, an Act that violates fundamental constitutional rights.

82.     We have demonstrated a substantial likelihood of success on the merits and irreparable harm. Additionally, the issuance of an injunction will not substantially harm any other parties and the public interest favors granting the injunction. Finally, Defendants have essentially agreed to an injunction. The Court should, therefore, issue preliminary injunction and a temporary restraining order.

32

## PRAYER

_83.     FOR THESE REASONS, Plaintiffs pray this Court will deny Defendants'
12(b)(6) motion to dismiss, retain our case on the docket and grant Plaintiffs'
motion for injunctive relief and TRO.


August 24th, 2006.                          Respectfully Submitted,


Russell Kaemmerling                         Daniel Siler
Reg. # 04899-017                            Reg. # 10183-078
F.C.I. Seagoville                           F.C.I. Seagoville
P.O. Box 9000                               P.O. Box 9000
Seagoville, TX 75159                        Seagoville, TX 75159


Rodney Doggett                              Brian Culwell
Reg. # 83059-080                            Reg. # 66552-079
F.C.I. Seagoville                           F.C.I. Seagoville
P.O. Box 9000                               P.O. Box 9000
Seagoville, TX 75159                        Seagoville, TX 75159


Ronnie Triplett
Reg. # 15692-064
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

## CERTIFICATE OF SERVICE

We certify under penatly of perjury, in accordance with 28 U.S.C. §1746, that we placed a true and correct copy of the foregoing Plaintiffs' opposition to the Defendants' 12(b)(6) motion to dismiss Plaintiffs' original complaint in the prison mailbox, properly addressed with prepaid first-class postage attached thereto, on the 25th day of August, 2006, and mailed to the following interested parties:

Andrea McBarnette,
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C.  20530
(Counsel For Defendants)

Russell Kaemmerling
Reg. # 04899-017
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Daniel Siter
Reg. # 10183-078
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Rodney Doggett
Reg. # 83059-080
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Brian Culwell
Reg. # 66552-079
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159

Ronnie Triplett
Reg. # 15692-064
F.C.I. Seagoville
P.O. Box 9000
Seagoville, TX 75159